UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NATASHA LASSITER-GARNER, Personal Representative of THE ESTATE OF ADABELL GARNER, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 22-cv-10019-ADB |
| NOAH SCHOENBERG, M.D.; KEVIN WILSON, M.D.; FRANKLIN FRIEDMAN, M.D.; PRIANKA CHAWLA, M.D.; FURMAN WALLS, M.D.; and UNITED STATES OF AMERICA, | * * * * * * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Adabell Garner died of lung cancer in 2019. In this action, Garner's estate, personally represented by her daughter, Natasha Lassiter-Garner, brings medical-malpractice claims against five doctors and against the United States. Before the Court is the United States' motion for summary judgment, [ECF No. 42]. For the following reasons, the motion is **DENIED**.

I.  **BACKGROUND**

   A.  **Factual Background**

The following facts are undisputed except where otherwise noted. DotHouse Health ("DotHouse") is a "federally funded health clinic that the Department of Health and Human

Services has deemed eligible for protection under the Federal Tort Claims Act," [ECF No. 1 ("Compl.") at 41]; see 42 U.S.C. § 233(g) (establishing FTCA coverage for certain health centers receiving federal funds); [ECF No. 43 ("United States Mem.") at 1 (referring to DotHouse as a "federally deemed health center")]. From July 2013 to November 2018, Adabell Garner was a regular patient at DotHouse. [ECF No. 47 ("SOMF") ¶¶ 44–55, 61, 68–75, 81–82]. Shortly after her final visit to DotHouse, Garner was diagnosed with lung cancer; she died on January 15, 2019. [Id. ¶¶ 83–84].

Garner "smoked for over 30 years," [SOMF ¶ 7], and her lungs were seemingly in poor health. For example, forced expiratory volume, or FEV1, measures how much air a person can expel in one second. See [id. ¶ 22 (defining FEV1)]. It is expressed as a percentage, with 80% being a normal value. [Id. ¶ 25]. As of 2011, Garner's FEV1 was 34%. [Id. ¶ 23]. At her first primary care visit with DotHouse, on July 24, 2013, Garner was seen by Nurse Practitioner Amanda Luong and was prescribed two inhalers for shortness of breath. [Id. ¶ 44]. Over six follow-up visits, between August 7, 2013, and June 14, 2014, Garner was treated for symptoms of chronic obstructive pulmonary disease ("COPD"). [Id. ¶¶ 45–52]. At one of those visits, Garner said that she had coughed up blood after getting a nosebleed. [Id. ¶ 46]. On May 17, 2015, she went to the Tufts Medical Center ("TMC") emergency department, reporting a cough and shortness of breath, where she was seen by Dr. Prianka Chawla. [Id. ¶ 56]. Dr. Chawla arrived at a "working diagnosis . . . that [Garner] had COPD with an exacerbation." [Id. ¶ 57]. Dr. Chawla concluded that Garner would "require follow-up with a CT scan," [ECF No. 45-16 ("Chawla Dep.") at 9]; [SOMF ¶ 58]. The parties dispute whether Dr. Chawla communicated to Garner that she should have a computerized tomography ("CT") scan. [SOMF ¶ 59].

In April 2015, Garner received additional pulmonary function testing, which revealed that her FEV1 had fallen to 26%. [SOMF ¶ 30]. On July 3, 2015, she had a follow-up visit at DotHouse for her COPD, after which Luong referred Garner to the pulmonology clinic at Boston Medical Center ("BMC"). [Id. ¶ 61]. Garner saw Drs. Kevin Wilson and Noah Schoenberg at the BMC clinic on August 25, 2015, [id. ¶ 62], who concluded that Garner "me[t] criteria for very severe COPD (Gold Stage 4), though she does not complain of significant [dyspnea on exertion] or severe lifestyle limitation." [ECF No. 45-19 at 5]. Following her BMC visit, Garner returned to DotHouse several times: on October 22, 2015, for a physical, [SOMF ¶ 68]; on March 3, 2016, for a follow-up visit, [id. ¶ 70]; and on May 30 and June 1, 2017, for care related to cough and shortness of breath, [id. ¶¶ 72–73].

On February 14, 2018, Garner went to the urgent care clinic at DotHouse, reporting "cough, shortness of breath, intermittent nosebleed, and coughing up blood." [SOMF ¶ 74]. Her "chest x-ray was 'clear' aside from 'hyperinflated' lungs." [Id.]. Garner returned to DotHouse on July 30, 2018, complaining of difficulty breathing. [Id. ¶ 75]. Dr. Vasileia Varvarigou referred her to the BMC pulmonology clinic, noting that Garner had not seen a pulmonologist in three years. [Id.]. On August 9, 2018, Garner visited the pulmonology clinic, [id. ¶ 76], where she reported increased difficulty breathing, including while showering and getting dressed, [id. ¶ 77]. During that visit, Drs. Kate Steinberg and Praveen Govender referred her for a low-dose CT scan, both for diagnostic purposes and to screen her for lung cancer. [Id. ¶ 78]; see also [ECF No. 45-6 at 13–14 (questionnaire completed by Dr. Steinberg related to lung cancer screening)].

Garner returned to DotHouse on October 9, 2018, for a physical examination with Dr. Varvarigou, and she discussed her plan to undergo a chest CT scan and additional pulmonary

3

function testing. [SOMF ¶ 81]; see [ECF No. 45-26]. She returned to DotHouse less than a month later, complaining of cough, chest pain, and shortness of breath. [SOMF ¶ 82]. Shortly after her last visit to DotHouse, on November 5, 2018, Garner went to the BMC emergency department with a broken leg, and while she was at BMC, a CT scan of her chest was conducted, which revealed a mass in her lung. [Id. ¶ 83]. She was diagnosed with lung cancer, and passed away in January 2019. [Id. ¶¶ 83–84].

### B. Procedural History

Natasha Lassiter-Garner filed this action on behalf of her mother's estate on January 5, 2022, against the United States, which will assume any liability arising from the care Garner received at DotHouse, and against five doctors who had seen Garner at Tufts Medical Center and Boston Medical Center. See generally [Compl.]. On June 9, 2022, the Court referred the matter to the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts for the purpose of convening a medical malpractice tribunal to assess the claims against the defendants other than the United States pursuant to Mass. Gen. Laws ch. 231, § 60B. [ECF No. 19]. On September 19, 2022, while the state court proceedings were pending, the United States answered the Complaint. [ECF No. 26]. On March 22, 2024, the case was transferred back to this Court from the Superior Court, which had entered findings in favor of Garner. [ECF No. 31]. The parties conducted discovery, and the United States moved for summary judgment on May 19, 2025. [ECF No. 42].

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "its existence or nonexistence has the potential to change

4

the outcome of the suit," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)), and it is genuinely disputed if "the evidence of record permits a rational factfinder to resolve it in favor of either party," id. at 4–5 (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "[T]he moving party must direct [the Court] to specific evidence in the record that would be admissible at trial," Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015), and show that the evidence either "negates an essential element of the non-moving party's claim," id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)), or "demonstrate[s] that the non-moving party will be unable to carry its burden of persuasion at trial," id. at 5 (quoting Carmona, 215 F.3d at 132).  Once the moving party has identified such evidence, the burden shifts to the party opposing summary judgment to "demonstrate that a trier of fact could reasonably resolve [each issue on which she would bear the burden of proof at trial] in her favor."  Borges, 605 F.3d at 5 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

The Court reviews "the entire record in the light most hospitable to the party opposing summary judgment," Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)), and draws all inferences "in the light most favorable to the party opposing the motion," Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)), but it will not credit "conclusory allegations, improbable inferences, [or] unsupported speculation," Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quoting Medina-Munoz, 896 F.2d at 8).

## III.      DISCUSSION

Garner's estate seeks damages from the United States pursuant to the Federal Tort Claims Act on the theory that DotHouse breached the applicable standard of care by failing to order a low-dose CT scan for purposes of lung cancer screening, which delayed the diagnosis and treatment of Garner's lung cancer.  [Compl. at 8–9, 40–45].  The government now moves for summary judgment on the basis that Garner "met the exclusion criteria for lung cancer screening due to her advanced [COPD]," [United States Mem. at 1], such that the failure to screen her for lung cancer did not breach an applicable standard of care, see [id. at 8–15], and further that treatment would have been impossible due to her COPD even if her cancer had been detected, meaning that any delayed diagnosis did not ultimately cause her harm, [id. at 15–16].

### A.      Standard of Care

In a negligence action, under Massachusetts law, "expert testimony is generally needed to establish th[e] professional standard of care." J.S.H. v. Newton, 164 F.4th 142, 149 (1st Cir. 2026) (alteration in original) (quoting LeBlanc v. Logan Hilton Joint Venture, 974 N.E.2d 34, 44 (Mass. 2012)); accord Palandjian v. Foster, 842 N.E.2d 916, 921 (Mass. 2006) ("Establishing the applicable standard of care typically requires expert testimony.").  The reference point for the standard of care is "the care that the average qualified physician would provide in similar circumstances," meaning that "the actions that a particular physician, no matter how skilled, would have taken," are not dispositive; physicians are not required to "provide the best care possible" to avoid liability.  Palandjian, 842 N.E.2d at 920–21 (first citing W.L. Prosser & W.P. Keeton, Torts § 32, at 187 (5th ed. 1984); and then citing Restatement (Second) of Torts § 299A cmt. e (A.L.I. 1965)).

The parties' experts differ as to whether the applicable standard of care required DotHouse medical staff to offer Garner a low-dose CT scan, beginning with her first visit and continuing throughout her treatment. The parties agree that particularly relevant to determining the standard of care is a recommendation issued on December 31, 2013, by the United States Preventive Services Task Force ("USPSTF"):

> The USPSTF recommends annual screening for lung cancer with low-dose [CT scans] in adults aged 55 to 80 years who have a 30 pack-year smoking history and currently smoke or have quit within the past 15 years. Screening should be discontinued once a person has not smoked for 15 years or develops a health problem that substantially limits life expectancy or the ability or willingness to have curative lung surgery.

[ECF No. 46-1 at 2 ("USPSTF Recommendation")]. FEV1, among other measures of lung health, is indicative of the ability to undergo curative surgery. See [SOMF ¶ 32].

An expert for Garner's estate, Dr. Robert Weiner, avers that "the accepted standard of care in Massachusetts from 2013 to the present requires" an average medical practitioner treating a patient with Garner's smoking history to:

> recognize the signs and symptoms of lung cancer, . . . fully investigate and carry out recommendations in a chest x-ray report, . . . properly assess the patient under the [criteria elaborated in the USPSTF Recommendation] for annual lung cancer screening, and . . . offer, order, or recommend a low dose CT scan to screen the patient for lung cancer and/or rule out malignancy.

[ECF No. 45-31 ("Weiner Rep.") at 11]. An expert for the government, Dr. Leigh Simmons, disagrees, concluding that DotHouse clinicians did not need to screen Garner because she "had [advanced COPD] that would have precluded lung cancer screening." [ECF No. 45-32 ("Simmons Rep.") at 8]. Dr. Simmons elaborates that "[a] reasonable clinician would have had serious reservations about her ability to undergo curative lung cancer treatment if a cancer were found," and that because "Ms. Garner was not a candidate for curative lung cancer surgery," she was "thus not a candidate for a lung cancer screening CT scan." [Id.]. Dr. Russell Hales,

7

another expert for the government, concurs: "Ms. Garner was never a candidate for curative surgery during her time receiving care at DotHouse and consequently, she was appropriately not referred for lung cancer screening." [ECF No. 45-33 ("Hales Rep.") at 5]. He explains that Garner's "pulmonary function" rendered her "not [a] candidate[] for lung cancer surgery," because she had a "life-limiting condition[]" that meant "lung cancer screening would not have improved her outcome." [Id.].

The parties' experts dispute whether the USPSTF Recommendation conclusively ruled out offering a low-dose CT scan to Garner. Dr. Simmons explains that "[l]ung cancer screening in primary care is offered to patients who meet specific inclusion criteria and do not have exclusion criteria for screening." [Simmons Rep. at 9]. She interprets the USPSTF Recommendation to impose such exclusion criteria:

> Importantly, the USPSTF guidelines note: "Screening may not be appropriate for patients with substantial comorbid conditions, particularly those who are in the upper end of the screening age range. The NLST (National Lung Screening Trial) excluded persons who were unlikely to complete curative lung cancer surgery and those with medical conditions that posed a substantial risk for death during the 8-year trial. . . . Persons with serious comorbid conditions may experience net harm, no net benefit, or at least substantially less benefit. Similarly, persons who are unwilling to have curative lung surgery are unlikely to benefit from a screening program.["]

[Simmons Rep. at 9 (quoting [ECF No. 46-1 at 4])]. On that basis, as well as consistent recommendations published by other medical policy bodies, Dr. Simmons concludes that "[b]y 2013, when she first met NP Luong, Ms. Garner did not meet [the clinical criteria for lung cancer screening]." Id. at 10. Dr. Simmons reiterates that, in her professional opinion, Garner "was not a candidate for lung cancer screening based on her severe COPD." Id. at 11. The government's other expert, Dr. Hales, agrees, concluding that under "national guidelines, Ms. Adabell Garner should not have been offered lung cancer screening." [Hales Rep. at 5]. Dr. Weiner disagrees,

8

contending that Garner met the criteria set forth under the USPSTF Recommendation. [Weiner Rep. at 10].

The parties' experts agree, however, that the USPSTF Recommendation is not the sole determinant of the standard of care. See [Simmons Rep. at 9–10 (discussing other sources of recommendations applicable to primary care)]; [Hales Rep. at 5 (referring generally to "national guidelines")]; [Weiner Rep. at 10 (describing that other "guidelines began to favor low-dose CT scans for lung cancer screening in specific high-risk groups" prior to December 2013)]. Further, under Massachusetts law, the standard of care is not determined by a "scientific[] test[]" or validated by "proven effective[ness]," but rather, is determined by "what the average qualified physician would do in a particular situation." Palandjian, 842 N.E.2d at 921.

The Court concludes that the applicable standard of care, including the applicability of the USPSTF Recommendation to a person with Garner's medical conditions and history, presents a genuine dispute of material fact. The parties present "two competing versions as to whether there was a violation of the standard of care," Primus v. Galgano, 329 F.3d 236, 244 (1st Cir. 2003), and deciding which version to credit falls to the factfinder, not to the Court at summary judgment. Among other things, the parties' experts disagree as to whether Garner would or should have been excluded from low-dose CT screening because of her severe COPD. Even if Defendants are correct that the USPSTF Recommendation should be read to recommend against screening people with "health problem[s] that substantially limit[] life expectancy or the ability or willingness to have curative lung surgery," [ECF No. 46-1 at 2], as opposed to simply not including them in the scope of its recommendation, there is still a genuine dispute as to whether Garner's health conditions would have disqualified her from subsequent treatment, such that screening would not be advised. See [Weiner Rep. at 10 ("Adabell Garner met the[]

9

criteria.")]; see also [ECF No. 46-1 at 36 (noting that "there is no absolute cut-off value" for predicting postoperative mortality using predicted postoperative FEV1)]; [ECF No. 45-4 at 20 (explaining that patients with an FEV1 below forty percent could be treated to "see if [the doctor is] able to get [the patient's] FEV1 better," at which point they might become "a surgical candidate")]. Viewing the record in the light most favorable to Garner's estate and drawing all inferences in the estate's favor, a factfinder could determine that the average qualified physician would have screened Garner for lung cancer using a low-dose CT scan.

### B.     Causation

The government further argues that Garner's estate has failed to produce adequate evidence that any failure by DotHouse practitioners to order a low-dose CT scan "caused Ms. Garner's death." [United States Mem. at 15]. Under Massachusetts law, a medical malpractice plaintiff must establish that the alleged negligence was the but-for cause of the injury, see Doull v. Foster, 163 N.E.3d 976, 982–90 (Mass. 2021) (clarifying causation standard), meaning that "the question is whether the defendant's conduct was necessary to bringing about the harm," id. at 983 (citing Restatement (Third) of Torts § 26 cmt. b (A.L.I. 2010)). The complaint focuses on two particular harms: Garner's death, e.g., [Compl. at 40], and her cancer-related "conscious pain and suffering," [id. at 41]. Although Garner's cancer was the direct cause of these harms, Massachusetts law recognizes the possibility of "multiple but-for causes," Doull, 163 N.E.3d at 987 (citing Reporters' Note to Restatement (Third) § 26 cmt. j), and a jury could decide that a defendant's "fail[ure] to diagnose" a fatal illness was one but-for "cause[] [of the harm," id. at 986, that is, that earlier detection would have enabled treatment that could have averted the harm.

Establishing causation in a malpractice case generally requires expert testimony. See Heinrich v. Sweet, 308 F.3d 48, 61 (1st Cir. 2002). Defendants argue that Garner will be unable

to establish causation because she will be unable to show (1) that she was eligible to receive a low-dose CT scan, see [United States Mem. at 16 ("Ms. Garner was indisputably excluded from the USPTF's lung cancer screening recommendation.")], and (2) that she would have been able to undergo curative surgery even if a CT scan had uncovered lung cancer, see [id. ("[Garner] was indisputably not a candidate for curative surgery.")].  These again are factual disputes best left to a jury.  Dr. Weiner's report explains that when lung cancer is "detected and diagnosed at an early stage," it is more likely to be "amenable to cure" and carries "an improved chance of long term survival," whereas if it is "detected at an advanced stage," such as "in the case of Adabell Garner," the patient is likely to "suffer a premature and preventable death."  [Weiner Rep. at 11].  Elsewhere, he concludes that as a result of DotHouse practitioners' allegedly deficient care, "Ms. Garner's lung cancer went undiagnosed and untreated for several years, resulting in advanced metastatic disease, which resulted in her premature and preventable death."  [Id. at 12].  If DotHouse practitioners had "offered, ordered, or recommended a low dose CT scan," Dr. Weiner believes that the lung cancer likely "would have been diagnosed and treated," and because the treatment would have occurred "at a much earlier stage when [the cancer] was still amenable to cure," Garner likely "would not have suffered a premature and preventable death."  [Id.].  Though he does not expressly engage with the government's arguments concerning Garner's lung health, Dr. Weiner's conclusions that Garner was eligible for screening and that she could have been treated if her cancer had been discovered imply that he did not view her lung health as a barrier either to screening or treatment.  Accordingly, Dr. Weiner's conclusions are adequate for a factfinder to determine that any deviation from the standard of care by DotHouse practitioners was a but-for cause of Garner's death.

IV. **CONCLUSION**

For the foregoing reasons, the United States' motion for summary judgment, [ECF No. 42], is **DENIED**.

**SO ORDERED.**

March 6, 2026                                                                                          */s/ Allison D. Burroughs*
                                                                                                                 ALLISON D. BURROUGHS
                                                                                                                 U.S. DISTRICT JUDGE